All rise. The court is now in session. Painting Room Be seated. 3-16-0322 Patricia Smith and Pamela Shuffchain Apolles Across appellants by Geoffrey Brock anything their Paula Bergstrasser же. Uh, Senator Blaine. If you give me the court's permission, and I print the award out, at my age of 83, I'm 83. You could do it if you were 93 that year. Or 73. Or 73. Those I should know, and I would print you out. Thank you. Thank you. May it please the court. Attorney Rock. My name is Joseph Napoli. I'm the attorney for, uh, the appellant in this cause. For simplicity's sake, we'll call them Lou and Paula. I would ask the court to bear with me a little and be patient with me because the time frame in this case is very important, so I'm going to have to give the court dates due to the fact that the case itself for the appellant requires me to slowly but surely let the court know what transpired during this time. Eileen and Joe Carra had four children. The siblings are fighting against each other. Two of their children are plaintiffs and two of their children are defendants. This was a family that, uh, survived together. Uh, the nicest family always being with each other, always seeing each other until 2008. In 2008, a great aunt died by the name of Corrine Williams. In her will, she provided for two people. One was the defendant, Lou Carra, and the defendant's father, Joe Carra. This irritated the two, uh, plaintiffs in this cause. Arguments ensued. They went to see the father. They thought it was unfair that, uh, Lou and the father would, would, uh, get all their money from the estate and they wanted a portion of the money. Uh, all hell broke loose and, uh, from that time on, from 2008 almost to the time she passed away, there was no reunions. There was nothing. In March, oh, excuse me, in 2009, notwithstanding the problem with the children, uh, Eileen Taylor, the testator, met with Keith Fumaitich, a lawyer in Peoria, and drafted a will. For all intents and purposes, what she did was to, uh, go ahead and leave a quarter of the estate to each child. Uh, in March of, uh, 2011, uh, Eileen had a stroke. Uh, uh, she had a fistula and, uh, she had some trouble. She was hospitalized, uh, but she came out of that very well. In September 6, 2011, five and a half years, excuse me, five and a half months after the stroke, she met again with, uh, Keith Fumaitich. Keith Fumaitich has been in practice for about 20, 25 years and does nothing except wills, estates, and trusts. So she drafted a, uh, a will and trust for her and, uh, the evidence showed that she spent two hours with her initially, not because she had a problem understanding her, but because this is her format. She spends two hours with her going after everything. Uh, when she comes back, she spends another two hours making sure. The will was, uh, in fact, executed. The attestation clause was there and, uh, it, uh, it took care of everybody except the two children, the two plaintiffs. She gave half the estate to Lou Taylor and half the estate to the other defendant, uh, Paula. It should be noted that the 2009 will, uh, the children had, uh, no idea what was in that will or if a will was made at that time. In 2013, unfortunately, uh, the testator took an overdose. She was a nurse. She took an overdose and, uh, she passed away. She committed suicide. The plaintiffs then filed a lawsuit in, uh, in August the 8th of 2014 and, uh, setting forth three counts, the usual and customary counts in a case like this. That would be lack of testamentary capacity, undue influence, and cautious interference, uh, uh, with the, uh, with, uh, an expectation. The case was set for hearing before Judge Corey on October the 29th and October the 30th of, uh, 2015. Prior to this time, the petitioners, uh, went ahead and they filed a, a motion, uh, for a presumption of undue influence listing the four propositions, the four requirements. That, uh, motion was not heard until after the trial was over. However, on the first day, excuse me, after the first day of trial, which is October the 29th, Judge Corey took it upon himself to make a statement, uh, to all the parties. Very briefly, I will go over this statement. I'm hesitant to say this, but I'm going to say it. I don't know why I'm going to say it. Maybe just therapeutic for me because I hate to see families in this situation. I come from a big family. I could go on and on, but he talks about relationships and ends it by saying, I encourage you to talk to your attorneys and take another shot at resolving it because if I resolve it, it's probably going to be winner take all. Throughout this trial, Judge Corey was trying to get a settlement. We have no problem with that. I've been a lawyer for 53 years. I've been in chambers so many times where the judge tries to put the parties together, talks to the lawyers, you know, Jeff, Joe, what's the problem here? What can you do to resolve this matter? This was something over and above board, over and above the usual and customary trying to get a case settled. On October the 20th, nine or ten days before the trial started, the petitioners filed a motion trying to find the presumption of undue influence. The motion was not heard at that time or excuse me, the decision was not heard at that time. What happened was the court proceeded on the 30th with the remainder of the trial. Then during the arguments on the motion, Judge Corey indicated to the lawyers, I'm going to go ahead and give you a case citation and the case citation was Supreme Court case Williams v. Ackman. That evening I pulled the case out, I checked it over and it was a case involving basically splitting up the baby, splitting the baby. What I need to say is that in that case Judge Corey saw something that he could do for the parties that did not receive anything under their will. What he looked at was the fact that in equipment he could punish so to speak the tortfeasor with the other party innocent, leaving that alone. By doing so he could chop up the tortfeasor's portion and give it to the people who didn't receive anything. That was always his format. For some reason his DNA was always I don't want to go ahead and let this family have a winner take all situation. This is what he tried to do. And then he encouraged the people look, look at this case. See if you can get something worked out. Go back and try to get it settled. Then what occurred was that on the 30th of November of 2015 the order came in on the on the motion and I'll read it to you. The plaintiffs have presented circumstances and direct evidence in support of a claim of undue influence on the part of the defendant Luke Taylor. Plaintiffs have therefore satisfied the requirement necessary for the court to find a presumption of undue influence. Then he goes on to say on the other hand defendants have presented sufficient evidence to rebut the presumption. For all intents and purposes this count disappears. The defendants have in fact rebutted the presumption. But Judge Goring said to himself wait a minute how can I then give these people who didn't receive anything under the will something. So he adds another paragraph. So that the parties are absolutely clear and notwithstanding the fact that the presumption has been rebutted nothing in this audit precludes this court from ultimately making a finding of undue influence after reviewing all the evidence. Your honors all the evidence was presented. The case ended on October the 30th. All the evidence was presented but he needed an opening so he put this in here. Once again he did not he was affixed with the fact that he did not want to leave these people out. The decision finally came in March the 9th of 2016. What he did he found in favor of the defendants Gould and Pauler as to count one capacity and found in their favor as to count three interference with the expectancy. The order lists 16 or 17 provisions. It is a case where he knew Luke Taylor he felt Luke Taylor did something wrong and he set forth in this order what he thought was wrong. For example in the order he says the court takes judicial notice of the following inter-family orders of protection and deems them generally relevant to the extent they further evidence of considerable inter-family strife. What he did he listed six cases he or someone on his behalf went to the courthouse went to the clerk's office and picked up six cases where Luke Taylor was mentioned. Five of these six cases had different parties in it. You know I remember a little bit about evidence how do you have a situation where you can take judicial notice of matters where in fact the parties are not the same. What he did here really for all the years he's been a judge he remembers those instructions to those juries you must stay within the framework of the evidence don't go outside the evidence and investigate on your own. This is exactly what he did. He made a mistake here. He went downstairs and listed all these cases. He goes on in the order and puts down on July 11th Luke stopped his mother's medication. He doesn't put in that it was stopped simply because Luke Taylor called up the neurologist Dr. Zoom Den who approved it and he doesn't even say at that point that as a result of taking her off of the medication she was another person. She was alive and well. He goes on and says a prior version of this scenario played out once before and he mentions the 2008 case where the aunt Corrine Williams gave Luke some of the estate. The language a prior version of this scenario really he's kind of making Luke Taylor out to be if I can use the word like a serial beneficiary. It's not called for in this case. He goes up Pardon me? Two minutes please. Right. He goes on and talks about the undoing fluids and this is the one that's really disturbing. He hangs his hat on a case in Tennessee. You would think when he listed all these other things he would say in his order I find undoing fluids a prior Luke Taylor because he did this that and the other thing. All the months in trial all the months before him I raised my hand and said look please before I leave this court tell me one thing that Luke Taylor did that constituted undoing fluids. Nothing came out. There's nothing in this file that shows that. So what does Judge do? He cites a case the Shisler case it's a Tennessee case near Binding but he says it's comparable to this not comparable whatsoever 180 degrees. That court in Tennessee vacated that will simply because the people participated. They sat with the lawyer and helped the lawyer then in fact went ahead and prepared or caused to prepare the document. And then again he used a equipment case to split the baby up. We would ask the court to please reverse that decision of undoing fluids and rule in favor of the defendant or the alternative to go ahead and remain it back for hearing just on the issue of undoing fluids. Thank you for your courtesy. Are you hoping it will go back to Judge Curry on remand? Oh no. I would think not. I would prefer at my age I would prefer remanded back for another trial because you may stop my retirement. Anything? Not right now. You will have five minutes. Thank you. Thank you for your attention. Mr. Rock. Thank you, Your Honor. May it please the Court, Jeffrey Rock for Pam Schuchane and Patty Smith. Judge Corey heard a lot of testimony in this case. He observed the witnesses, he was able to weigh the evidence, and he made factual findings that there was undue influence exerted on Mrs. Taylor. Mr. Napoli leaves out a plethora of facts to this Court. This will was done after she had a horrible stroke. Even after all the family strife that went on in the 2000s, there was a 2009 will where each one of the children were treated the same. Mrs. Taylor has a stroke in which she can't speak, she can't communicate, she is hospitalized for two weeks in intensive care. Luke Taylor, unilaterally, against the advice of Pam Schuchane, who is a critical care nurse, takes her home and does not give her any other treatment for a while. His plan, and what happened here, was he decides to take her to legal counsel to get a new will and trust done. Then we're going to go to intensive therapy. At the time she went to Keetra Mitage, Luke Taylor takes her there for the initial meeting. This is before she goes to the intensive treatment in Chicago, about a month later. When she gets to Chicago, the speech therapist, whose deposition is in the case, said she could understand maybe three to four words at a time. She could speak maybe three to four words at a time. And if you look at Paul's deposition, that's the speech therapist, she was saying that there really was no cognition about what the testator didn't know. I don't know, my stroke is so bad, I don't know what I don't know. And the most telling thing is, after this will is done, Luke Taylor and Paul Gerkstra ask her to take her to this intensive care unit in Chicago. In the history, it says, we would like to have our mother learn our names. That's undisputed in the record. The deposition of the person who was in charge of the case said that's what they told me when they came in. And if you look at Paul's testimony, she couldn't even test Mrs. Taylor after this 20-page will and trust was performed and signed. She couldn't test her because Mrs. Taylor couldn't understand what the questions were. That we can't even understand what your cognition is because you can't understand what we're asking. So the trial judge found that maybe there was some undue influence there, that she somehow was taken to Ketermaitich by Mr. Taylor. Mr. Taylor waits for her. Ketermaitich goes through the initial conference and then prepares a trust. Comes back by Mr. Taylor, brings her back. This is before we go to Chicago, where they say she can understand three words at a time. Ketermaitich testified, well, I sat with her for two hours and we went through the entire trust and she seemed to understand what was going on, even though she was difficult to communicate with. And Maitich said, I don't have a real recollection of our meeting. But if the court looks at it, if there's a person who is taken to a specific high-tech, sophisticated rehab program where they said she can't, if you look, there's a lot of examples. After repetitive training, she could not recite three action verbs and three nouns. This is a month after she does a 20-page trust where she sits with the lawyer for two hours and the lawyer says, well, I think she understood what she was doing. Judge Corey acted correctly when he said, look, there's undue influence here. Didn't the judge find that she had capacity, though? Aren't you speaking to the court's lack of capacity because of this? Well, I think that has to do with the undue influence in that she is more susceptible, and I think Ball testified she is more susceptible, to influence because she doesn't understand. And that is part of our cost appeal, is that clearly we don't think she had capacity. I think Judge Corey erred in that respect, in that every healthcare professional, Dr. Salazar was her doctor. Dr. Salazar had the opinion she would be subject to undue influence. She said, I'm afraid she's suicidal. Lou Taylor and Paula Burks, who asked her, take her off her meds after that, even though the doctor has recommended those. If you... Excuse me. So Judge Corey heard the testimony, and had the depositions, which showed that she had barely any cognition at all, after this stroke. And again, there were things that were done, that kept her away from Patty and Pam, because against all advice, they take her out of the hospital after two weeks, and take her home. The remedy in this should be that, the courts go back, to the prior testamentary instrument. Because this was clearly, a product of undue influence. The court should also find that there was tortuous interference, with an expectancy here. Because again, the evidence is uncontradicted. Paula and Lou, ignore the doctors. We're not taking her back. We're not going to get her her medication. And then they take her to an attorney, to get a 20 page trust done, that's actually stupefying to read, and try to understand. And at that point in time, she can understand three or four words at a time. So I'm asking the court to affirm, the finding of undue influence. That Judge Corey heard the witnesses, he judged the evidence. But I don't believe that he gave the appropriate remedy. You have to strike that whole trust, if there was undue influence. You can't split among the parties. That's where I think Judge Corey made an error, that he granted a remedy that he shouldn't have granted. That I don't think he could grant. The remedy is, if the instrument is faulty for whatever reason, undue influence, you can't have any effect from that instrument. It's just got to be gone, you go back to the prior instrument. So what he should have done was say, look, there's undue influence, I have to toss this trust that was done after the stroke, and I have to return to the prior instrument, which splits four ways, the estate of the deceased. I think that was the proper remedy. The court, I think, is bound by his factual finding. He saw the witnesses, he heard everybody. He considered there to be undue influence, and I think that's a factual finding that really shouldn't be overturned, because it's not against the manifesto of the evidence. With that finding, you have to say, the whole trust is invalid, because she was unduly influenced. On top of that, I think it's clear from the record, if you read Judy Ball's testimony, who's the therapist who goes after the trust is made, this woman, because of the stroke, could understand very little. There is no way, if the court reads Ball's testimony, if you can't understand three words at a time, and you can't repeat three words at a time, that somehow you can understand, I have got this whole plan for my probate, and how I want my estate to be given out, when the, and again, Ball says, I couldn't even evaluate her, because she couldn't understand the questions. So, I would pose to the court, there is no way that she could understand, this is my property, this is my plan, to distribute my property, and I'm going to prepare a testamentary instrument to do that. So, I think the court should affirm Judge Corey, saying that it was undue influence, also find that there was tortious interference, and that the remedy be, that the prior instrument takes effect. Thank you. May I ask you a question about the orders of protection that Judge Corey took judicial notice of? Did anybody request Judge Corey to take judicial notice of those order of protection files? No. What is your position on that, as to whether it was relevant information that Judge Corey took? I think it was harmless, I guess, because if you look at the transcript, we're trying to get a son of one of the plaintiffs thrown in jail, we're doing this, we're arguing, I think it is cumulative of all of the strife in this family that was testified to during the trial, because clearly, for example, Paula Birdstresser and the plaintiffs had testimony about how they became estranged, and how they became, you know, became a part, and there was all the family dynamic that I don't think that added or did practically anything. I mean, Judge Corey just said, look, this is a family dispute of big proportions. Everybody knew that, and I don't think those had anything to do with it, Justice Reinhart. Do you know what he looked at? Did he look at orders? Did he look at the petitions? Because for an order of protection, you can have an ex-party petition. Do we know what he looked at? What he examined? Because there's a lot of hearsay in the OP files. Sure there is. Were there transcripts that he reviewed? We don't know. He referenced them in the order which was the final order, so there was really no discussion about that. He just referenced them by case number. Correct. So we don't know what he did. And it appears that four out of the five order of protections immediately followed the stroke. I mean, certainly a family can experience a lot of chaos when the matriarch suffers a stroke. If you look, there was testimony that my clients were concerned for their safety and were scared of Lou Taylor. Because mom was down. Mom was down, and they just took a back seat. Okay. I appreciate you answering my question. Thank you. Thank you, Mr. Roth. With all due respect to my good friend, Mr. Roth, I'm looking at testimony of Ms. Ball. Arlene was able to express to Ball that her goal was that she wanted to control everything of hers, and Ball found that to be competent statement. Ball further felt that Arlene could recognize her children. She commented that she could only make an opinion as to the day she saw her. No doctor, Dr. Salazar, who fed her the medication, and as soon as she came off that medication, she was another person. None of the doctors, nor Ball, could testify as to what her competency was at the time she executed the documents. What we have here, even Judge Corey, went ahead and found that she had the capacity. You have the attestation clause. Nobody was called insofar as the witnesses. The neurologist was not called by the plaintiff. The neurologist was the one who approved the reduction of the medication, and as I said before to the court, it was a world of difference. I can understand that Mr. Roth's position, especially insofar as the will is concerned, when Article I of the will, my family, she names all her children, and then she says, I hereby acknowledge the existence of my daughters, Patricia Smith and Pamela Schuchane, and have intentionally and with full knowledge chosen not to provide for Patricia Smith and Pamela Schuchane or their issues. I can see Mr. Roth's concern, but what he'd have to show is there's a conspiracy between a very prominent women attorney of 25 years who devotes herself to wills, estates, and trusts, and also the station clause with the witnesses. Once again, we will do our position. Again, I'm going to be a pest, but I have some questions about the orders that Judge Curry took judicial notice of. I'm sorry? I have some questions about the files that Judge Curry took judicial notice of. Yes. I'm uncertain how to handle that information because I presume those files are not part of this court record. It is true. So, are we to follow the pattern of Judge Curry and take judicial notice of those files and ask to have them sent up here for us to look at? What is your position on how we treat information the judge judicially noticed that is not included in this record? To me, that's reversible error. How can you possibly do that? You can't go and pull out a file. The parties are not even the same. The question is, why did he do that? Did the orders of protection involve protecting Aileen at all? None. From Lou? None. So, none of those files, which we can't look at, had to do with protecting Aileen? That is correct. If I may, there was one other witness and that was an attorney by the name of Kevin Sullivan who was an adversary. He represented one of the children of the plaintiffs and he met with Aileen and before Aileen filed a restraining order, an order of protection against the children for bothering her, trying to come over to the house, trying to get into the house. You need to stop. So there was another order of protection case where Aileen was the petitioner? Aileen was the petitioner. Corey did not take judicial notice of? That's true. And he testified, Kevin Sullivan testified, that he met with Aileen. Did Aileen in that file seek protection from Lou? No, no. No, Aileen never did that. Then, did this information come out in the record for Judge Curry to consider? Then we can't consider it here. But the testimony of Kevin was that he met with Aileen and Aileen was very cooperative. He understood everything. She was articulate and such. Thank you for answering my question. Thank you. Thank you, Mr. Neff. Thank you. Mr. Rock, you're sure about the filing. Well, Mr. Rock, can I start out by asking how can Judge Curry pick and choose which prior OPs to take judicial notice of? Can you address that? And what are we to do? How do we evaluate this when those files are not part of this record? I think if you look at Judge Curry's order, he referenced that this is just evidence of the strife between these family members. I don't read that order that that made any difference in his evaluation of the case. He's just saying, look, this is one of the I've been through this. Here's what I saw. That all of these people have had numerous issues over the years. I don't read his order if you look at it, Justice Wright, that he's saying, oh, this really makes a difference. I don't know why he chose to look at those, but clearly there was testimony that people were getting. You've answered my question. So what is your position on what do we look at? Do we put our blinders on? With respect to the orders? Or any orders that were issued involving this family in the relevant time frame? March from the time of the stroke until 2012, which is September 2012, which is the last OP. Right. I just want to know what If you look at it, it's not It's kind of fringe things. It's not, okay, I don't want my daughter, Patty, coming to visit me. But what do you want us to do? Just not do more research or confine our research to what Dr. Curry did? I think we just have to go with what is in the record. I think if you look at the order I took it to mean he just looked at this as confirmation that this is a family that doesn't get along. And if you look at it, I don't think he really draws anything more from that. I don't want to chew up too much information. I just want to address the Kevin Sullivan testimony very quickly. That was 15 months after the stroke that Kevin Sullivan, who was called by Mr. Napoli said, oh yeah, I talked to her and she seemed to be okay. That was 15 months after the stroke. So I don't think the time period is particularly relevant. Yes, she got better. But the point is she does, if you look at the timing, she does this complicated trust and then Lou Taylor and Paul Bergstrasser take her to therapy. That seems backwards to me. If you say, geez, mom can't understand, we can't talk to her, she's a phasic. Well, let's get the trust document done before we go to intensive treatment. Where Paul says she really doesn't understand more than three or four words at a time. I think that is the critical fact here. Why on earth would you say, let's go get a trust document that's 20 pages long that stupefies a lawyer trying to read it and understand it and then, only then do we take mom for intensive therapy. What's the rush? Well, the rush was we want to make sure that that gets changed before we get treatment. I think that's the inference. I think Judge Corey, he heard these people and there was a lot of contradictory testimony. I think the court needs to say his finding of fact that there was undue influence has to be given some deference. I do think that he made a mistake when he didn't do the tortious interference also. What difference does that make to your case? Well, I think that there would be the possibility. I think there is a possibility for attorney's fees and some other remedies under those two theories that you don't have just by invalidating the instrument. I think for the tortious interference there could be attorney's fees and possibly other damages that you would not have under the, just straight we're going to take the document out so that adds to that. I have a rhetorical question just because it's so fun to pick your brain. If she lacked capacity and you're hoping that we will reverse Judge Corey's ruling on that. If she lacked capacity to work with the attorney to develop these complex documents. Does she have the capacity to be influenced unduly? Are they mutually exclusive to each other if you lack capacity to formulate an intent? Can you be unduly influenced? That's my question. And you don't have to answer it if you would rather not. That is a difficult question. Because you want us to say she lacked capacity. She was unduly influenced and there was interference. Right? Correct. And if you prefer not to help me with my struggle. And I think certainly on the interference if they're keeping her from her That's unduly as to her. Right. It's difficult to say with her level of understanding whether she could have been. In fact if you look at the testimony she was really not I think your point is well taken Justice Wright. That may be an issue or a cause of action that probably might not be available. This is the benefit of oral arguments. There are little lurking issues in our brains sometimes that we don't get a chance to banter about with you. I appreciate your indulgence in my question. Thank you. Thank you.